IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**SANDRA JEAN TALBERT,**

 **Plaintiff,**

v.               Civil Action No. 3:19-cv-00005

**ANDREW SAUL,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

 **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Plaintiff Sandra Jean Talbert ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on January 3, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)  Presently pending before this Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 15) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 18).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for judgment on the pleadings (ECF No. 15), **GRANT** the Commissioner's request to affirm his decision (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.  BACKGROUND

A. *Information about Claimant and Procedural History of Claim*

Claimant was 52 years old at the time of her alleged disability onset date and 57 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 77, 257.)[2] She completed one year of college. (*Id.* at 262.) Most recently, she worked in healthcare billing, and she has also been employed as a managed care coordinator and a healthcare scheduler. (*Id.* at 263.) Claimant alleges that she became disabled on August 31, 2012, due to depression, anxiety, lower back pain, scoliosis, osteopenia, arthritis, high cholesterol, and panic attacks. (*Id.* at 261–62.)

Claimant filed her DIB application on July 1, 2015 (*id.* at 222–23), and her SSI application on the same day (*id.* at 224–29). Her claims were initially denied on September 21, 2015, and again upon reconsideration on March 4, 2016. (*Id.* at 77–100.) Thereafter, on April 29, 2016, Claimant filed a written request for hearing. (*Id.* at 159–60.) An administrative hearing was held before an ALJ on December 21, 2017, in Charleston, West Virginia. (*Id.* at 51–76.) On March 19, 2018, the ALJ entered an unfavorable decision. (*Id.* at 13–30.) Claimant then sought review of the ALJ's decision by the Appeals Council on May 18, 2018. (*Id.* at 216–17.) The Appeals

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9.

Council denied Claimant's request for review on November 1, 2018, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

Claimant timely brought the present action on January 7, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative proceedings (ECF No. 9). Claimant subsequently filed her Memorandum in Support of Judgment on the Pleadings (ECF No. 15), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 18). As such, this matter is fully briefed and ready for resolution.

B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1. *Claimant's Overdose and Subsequent Mental Health Treatment*

Claimant presented to the emergency department at Charleston Area Medical Center on June 2, 2014, following an overdose. (Tr. at 340–41.) She told the attending physician that "[s]he took a handful of Klonopin and took three shots of tequila." (*Id.* at 340.) When asked if the overdose was a suicide attempt, Claimant replied "maybe" and reported that she was "not getting along with two of her sisters, that they hate her." (*Id.*) Before leaving the hospital, Claimant represented to another physician that "she just became frustrated over her family situation and took the pills" but denied "want[ing] to kill herself or die." (*Id.* at 338.) Claimant was discharged the same day and instructed to begin counseling. (*Id.*)

Three days later, on June 5, 2014, Brett Wilson, M.A. ("Mr. Wilson"), a therapist at Prestera Center, Inc. ("Prestera"), conducted a mental health assessment of Claimant. (*Id.* at 378–82.) Regarding the June 2 incident, Claimant reported to Mr. Wilson that "she had an argument

3

with family . . . and was so worked up she started drinking and took a bunch of pills." (*Id.* at 378.) Claimant stated that "she was not trying to commit[] suicide[,] she was just trying to relieve the stress." (*Id.* at 379.) Claimant also reported being prescribed medication for depression and anxiety since 1995. (*Id.*) Claimant's mental status examination was normal, except Mr. Wilson noted that Claimant had "[d]eficient" coping skills and some short-term memory issues. (*Id.* at 380.) He further noted that Claimant had no suicidal or homicidal ideations. (*Id.* at 381.) Mr. Wilson diagnosed claimant with "Major Depressive Disorder, Recurrent, Mild . . . With Melancholic Features." (*Id.*) At Claimant's request, Mr. Wilson scheduled an appointment for a psychiatric evaluation with a Prestera physician and an additional therapy appointment. (*Id.* at 379.) However, Claimant "did not show" for the psychiatric evaluation. (*Id.* at 384.) She attended therapy sporadically until November 14, 2014, and on April 10, 2015, Prestera discharged Claimant from its program because she "dropped out of treatment." (*Id.* at 383, 385–86.) Upon discharge, a Prestera social worker noted that Claimant "made little to no progress in treatment as she failed to follow through on assignments and failed to keep regular appointments." (*Id.* at 385–86.)

On June 25, 2015, Claimant presented to her primary care physician, Dr. John M. Clark, M.D. ("Dr. Clark"), complaining that her anxiety was "worsening" and that she was having panic attacks. (*Id.* at 481–82.) Claimant reported "constant up and downs in her mood levels," "worsening" inability to sleep, "decreased energy," "worsening" concentration, and "frequent[]" racing thoughts. (*Id.* at 481.) However, Dr. Clark observed upon examination that Claimant was "alert and oriented to person, place, and time" and that her "mood and affect [were] normal." (*Id.*) He diagnosed Claimant with "Depression with anxiety" and referred her to Dr. Sanjay Masilamani, M.D. ("Dr. Masilamani"), a psychiatrist. (*Id.* at 482.)

Claimant presented initially to Dr. Masilamani on September 29, 2015. (*Id.* at 576–81.) She reported "depressive symptoms," "decreased sleep," increased appetite, depressed mood, "feelings of guilt," "crying spells and symptoms of anhedonia," and "voices . . . saying derogatory things to her." (*Id.* at 577.) Despite representing to emergency room personnel and Mr. Wilson that her 2014 overdose was not a suicide attempt (*id.* at 340, 379), Claimant told Dr. Masilamani that "she attempted suicide 1 time in 2014" but "denie[d] any current suicidal ideations" (*id.* at 577). Claimant also denied delusions and hallucinations. (*Id.*) Upon examination by Dr. Masilamani, Claimant's mental status was normal. (*Id.* at 580.) Dr. Masilamani diagnosed Claimant with "Major depressive disorder, recurrent, moderate" and "Generalized anxiety disorder." (*Id.*) He modified her medication and encouraged her to "work[] with a psychologist." (*Id.* at 581.) Claimant presented to Dr. Masilamani regularly over the following six months, and although he made changes to Claimant's medications based on Claimant's complaints about their side effects, Claimant's mental status examinations were normal aside from observations that her mood was "depressed," "down," or "irritable." (*Id.* at 560–72.) On May 31, 2016, Claimant reported feeling suicidal, but Dr. Masilamani observed that she was in a "good" mood. (*Id.* at 600–01.) At monthly appointments throughout the remainder of 2016, Claimant reported feeling depressed, irritable, and angry, but again, her mental status examinations were normal aside from observations that her mood was "depressed," "down," or "irritable." (*Id.* at 557–59, 573–75, 583–95.)

At her appointments during the first half of 2017, Claimant continued to report side effects associated with her medication, some trouble sleeping, and feeling depressed and irritable. (*Id.* at 554–56, 607–09, 641–52.) On April 28, 2017, she reported suicidal ideation, but aside from depressed mood, her mental status examination was normal. (*Id.* at 641–42.) Dr. Masilamani started Claimant on a new medication and encouraged her to exercise and "get outside every day."

(*Id.* at 642.) Claimant did not follow these instructions, as she reported at her next appointment on May 25, 2017, that "she ha[d] not been out of the house since the last time she [was] here." (*Id.* at 644.) Still, her mental status examinations were largely normal that day and at her appointments over the next few months, and Dr. Masilamani continued to recommend that Claimant exercise and spend time outside. (*Id.* at 644–49.) On August 21, 2017, Dr Masilamani noted that he had "attempted to get [Claimant] to work with a psychologist[,] but she is still resistant to do so." (*Id.* at 652.)

On September 20, 2017, Claimant presented to Carolyn Scarberry, LPC ("Ms. Scarberry"), a counselor, complaining of depression, "conflict with her 3 sisters," "sleep disturbance, low energy, [and] isolation." (*Id.* at 787–89.) Claimant "describe[d] herself as 'difficult'" and reported being "unable to keep a relationship or [h]old down a job." (*Id.* at 787.) She told Ms. Scarberry that "the counseling has never helped and she usually quits" and "medication . . . helps some but has to be changed often." (*Id.*) Claimant also described her 2014 overdose as a "suicide attempt." (*Id.*) Upon examination, Ms. Scarberry noted that Claimant's "Judgement was impaired" and her "behavior demonstrated[] [c]ompulsion and psychomotor agitation." (*Id.* at 788.) Ms. Scarberry further noted that Claimant's "attitude was guarded," and her mood was "[h]ypomanic" and "depressed." (*Id.*) She diagnosed Claimant with "Moderate recurrent major depression" and recommended "weekly therapy sessions to help with depression and anxiety." (*Id.*) Claimant met with Ms. Scarberry again on October 12, 2017, and her mental status was normal aside from impaired judgment, anxious mood, and constructed affect. (*Id.* at 779–80.) Ms. Scarberry observed that Claimant "seems to be interested in talking about her problems but [is] not willing to make any changes in her life." (*Id.* at 780.) She described Claimant's prognosis as "fair." (*Id.*)

### 2. Consultative Examination: Ernie Vecchio, M.A.

Ernie Vecchio, M.A. ("Mr. Vecchio") conducted a clinical interview and mental status examination of Claimant on September 14, 2015. (*Id.* at 437–41.) Claimant reported to Mr. Vecchio that she was "falling apart" mentally, had panic attacks, and felt "nervous and scared all the time." (*Id.* at 438.) She reported feeling "nervous and real quivery inside" that day, with "weird," "mostly down" moods. (*Id.*) She also reported, "[O]n June 1, 2014[,] I tried to hurt myself. I took a bunch of pills with some alcohol and ended up in the ER." (*Id.*)

Upon examination, Mr. Vecchio observed that Claimant was "somewhat apathetic, depressed, overweight, guarded, [and] immature." (*Id.* at 439.) He observed that her mood was "[d]epressed and anxious" and that her affect was "[t]earful." (*Id.*) Mr. Vecchio also noted that Claimant's social functioning was "[w]ithin normal limits" but "[m]ildly deficient based upon [Claimant's] demeanor and agitation." (*Id.*) He observed that Claimant had "[p]oor" insight and "[m]oderately deficient" recent memory, but the remainder of her exam was within normal limits. (*Id.* at 440.) Mr. Vecchio diagnosed Claimant with "Major Depressive Disorder, Recurrent, Moderate" and listed her prognosis as "[p]oor." (*Id.* at 441.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R.

7

§§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her

ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through December 31, 2017. (Tr. at 18.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) He found that Claimant's degenerative disc disease and obesity constituted "severe" impairments. (*Id.* at 19–21.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 21.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except she can only occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and

crawl." (*Id.* at 21.) In addition, the ALJ found that Claimant "can occasionally work at unprotected heights." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was able to perform her past relevant work as a health care billing clerk, medical scheduler, or managed care coordinator "as actually and generally performed." (*Id.* at 24.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from August 31, 2012, through the date of this decision." (*Id.*)

## II. LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III. ANALYSIS

Claimant argues that the ALJ "misstat[ed] certain facts" and "omitt[ed] probative evidence" in finding that her mental impairments were not severe. (ECF No. 15 at 6–14.) She claims that this "introduced error into the sequential process that was not corrected at any subsequent step." (*Id.* at 14.) Claimant asks this Court to reverse the Commissioner's decision and remand this matter to the ALJ to correct the error. (*Id.* at 15.) The Commissioner responds that the ALJ properly determined that Claimant's mental impairments were not severe because she had no or only mild limitations in the four functional areas and that the ALJ accurately represented the medical evidence of record in his decision. (ECF No. 18 at 8–15.)

To evaluate the severity of a claimant's mental impairments using the "special technique" prescribed by the regulations, the ALJ first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1520a(b)(1)). Next, the ALJ must "rate [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). Specifically, the ALJ analyzes a claimant's functional limitations by assessing the claimant's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). If the claimant has no limitations or only mild limitations in these four areas, her "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [her] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ found that Claimant's major depressive disorder and anxiety disorder were medically determinable mental impairments. (Tr. at 20.) He noted that Claimant had been

diagnosed with major depressive disorder and was prescribed medication to treat her depression and anxiety. (*Id.* at 19.) The ALJ also noted that Claimant "required hospital treatment" in June 2014 after "she had been drinking tequila and took pills" but that her mood had more recently "been stable." (*Id.*) In assessing Claimant's mental functioning, the ALJ found that Claimant had mild limitations in the areas of understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. (*Id.* at 20.) He found that Claimant had no limitation in concentrating, persisting, or maintaining pace. (*Id.*) The ALJ's conclusions were based on Mr. Vecchio's consultative examination report and on Claimant's own statements about her activities and abilities. (*Id.*)

Claimant argues that the ALJ "mischaracterized [her] June 2014 emergency room visit as resulting from a binge episode of 'drinking tequila and [taking] pills'" instead of "an overdose of prescription medication out of frustration from mental stressors." (ECF No. 15 at 7.) Although Claimant told Dr. Masilamani and Ms. Scarberry several years later that this incident was a suicide attempt (Tr. at 577, 787), she never said as much to hospital personnel or to Mr. Wilson at Prestera around the time of the incident (*id.* at 340, 379). Further, as the Commissioner points out, Claimant's family took her to the hospital in June 2014 at her own request, and she was discharged the same day without being admitted for psychiatric treatment. (ECF No. 18 at 13; Tr. at 338.) This suggests that the ALJ correctly determined that Claimant's mental impairments were not severe. *See Jividen v. Colvin*, No. 3:12-cv-04698, 2014 WL 1333196, at *5 (S.D.W. Va. Mar. 18, 2014) (agreeing with ALJ's finding that claimant's depression and anxiety were not severe because they required only conservative treatment with medication). Moreover, Claimant rarely reported feeling suicidal in subsequent treatment with Dr. Masilamani, and when she did, her mental status examinations were nonetheless normal. (Tr. at 600–01, 641–42.) Indeed, Claimant reported feeling suicidal at an appointment on May 31, 2016, but Dr. Masilamani observed that she was in

13

a "good" mood. (*Id.* at 600–01.) Therefore, regardless of whether the June 2014 incident was a suicide attempt or merely a "binge episode," the ALJ was not required to conclude based on that incident alone that Claimant's mental impairments were severe. *Ghaul v. Berryhill*, No. 7:16-cv-00497, 2017 WL 3433216, at *4 (W.D. Va. Aug. 9, 2017) (determining that claimant's depression properly characterized as non-severe despite "weeklong hospitalization . . . subsequent to her debatable suicide attempt").

Claimant also contends that the ALJ "cherrypicked" Mr. Vecchio's consultative examination report by "citing only to the parts the ALJ believed supported his . . . analysis." (ECF No. 15 at 7.) She asserts that the examination "revealed significant effects from [her] mental impairments beyond the 'normal' findings the ALJ chose to consider." (*Id.* at 8.) To the contrary, consistent with the ALJ's opinion, Mr. Vecchio's mental status examination of Claimant was in large part normal. (Tr. at 439–41.) Despite noting that Claimant's mood was "[d]epressed and anxious" and that she had a "[t]earful" affect and "present[ed] as somewhat apathetic, depressed, . . . guarded, [and] immature," Mr. Vecchio described Claimant's social functioning as "[w]ithin normal limits," albeit "[m]ildly deficient based upon demeanor and agitation." (*Id.* at 439.) The ALJ took these observations into consideration when determining that Claimant "has a mild limitation" in interacting with others. (*Id.* at 20.) Similarly, the ALJ determined that Claimant "has a mild limitation" in understanding, remembering, or applying information because Mr. Vecchio noted moderate deficiencies in her recent memory. (*Id.* at 19, 20.) But "a mild limitation," even in all four functional areas, does not result in a finding of a severe mental impairment. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Claimant points to no objective medical findings suggesting that she has more than mildly deficient social functioning or memory or is otherwise unable "to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). In the two years following Mr. Vecchio's

consultative examination of Claimant on September 14, 2015, Claimant's mental health providers' findings regarding her mental status were mostly normal aside from "depressed" or "irritable" moods. The record thus supports the ALJ's ultimate conclusion that "[C]laimant functions at a higher level . . . psychologically than alleged." (Tr. at 23.)

Lastly, Claimant argues that in emphasizing Claimant's discharge from Prestera in April 2015, the ALJ "ignored other evidence that [Claimant] had been compliant with mental health appointments and medication since 2015." (ECF No. 15 at 8.) As an initial matter, "there is no rigid requirement that the ALJ's decision cite to or discuss each piece of evidence." *McLamb v. Astrue*, No. 5:08-CV-305-FL, 2009 WL 2046062, at *2 (E.D.N.C. July 14, 2009) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). More importantly, Claimant stated on more than one occasion that she generally stopped going to therapy because she did not believe that it helped. (*See* Tr. at 348, 787.) Dr. Masilamani urged Claimant to see a psychologist to help with her depression, but Claimant refused. (*Id.* at 581, 652.) Ms. Scarberry observed that Claimant "seems to be interested in talking about her problems but [is] not willing to make any changes in her life." (*Id.* at 780.) Therefore, contrary to Claimant's assertion, she was not entirely "compliant" with her treatment even after her discharge from Prestera. The ALJ also pointed out that Claimant had no mental health treatment at all between her alleged onset date of August 31, 2012, and April 4, 2014. (*See id.* at 19.) And despite frequent changes in her medication while seeing Dr. Masilamani in 2016 and 2017, Claimant's mental status examinations were normal aside from observations that her mood was "depressed," "down," or "irritable." (*Id.* at 554–75, 583–95, 607–09, 641–52.) There is no indication that Claimant was incapable of "function[ing] independently, appropriately, effectively, and on a sustained basis" as a result of the changes in medication. 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).

15

Accordingly, the undersigned **FINDS** that substantial evidence supports the ALJ's conclusion that Claimant's depression and anxiety were not severe impairments and did not otherwise cause functional limitations.

## IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for judgment on the pleadings (ECF No. 15), **GRANT** the Commissioner's request to affirm his decision (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties, District Judge Chambers, and the undersigned Magistrate Judge.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  September 9, 2019

_____
Dwane L. Tinsley
United States Magistrate Judge